AO 108 (Rev. 06/09) Application for a Warrant to Seize Property Subject to Forfeiture

# UNITED STATES DISTRICT COURT
for the
District of New Mexico

| | |
|---|---|
| In the Matter of the Seizure of<br>*(Briefly describe the property to be seized)*<br>The Entirety of the Funds Held in Rio Grande Credit Union Account # 1000103299 | )<br>)<br>)   Case No.  **23mr58**<br>)<br>) |

## APPLICATION FOR A WARRANT
## TO SEIZE PROPERTY SUBJECT TO FORFEITURE

I, a federal law enforcement officer or attorney for the government, request a seizure warrant and state under penalty of perjury that I have reason to believe that the following property in the _____ District of ___New Mexico___ is subject to forfeiture to the United States of America under ___21___ U.S.C. § ___881(a)(6)___ *(describe the property)*:

The Entirety of the Funds Held in Rio Grande Credit Union Account # 1000103299.

The application is based on these facts:
See attached affidavit, prepared by SA Kevin Mondragon. This affidavit was reviewed and approved by AUSA Taylor Hartstein on January 9, 2023.

☑ Continued on the attached sheet.

*Applicant's signature*

Kevin Mondragon, DEA Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by being telephonically sworn and electronically signed.

Date: January 9, 2023

*Judge's signature*

City and state: Albuquerque, New Mexico

John F. Robbenhaar, U.S. Magistrate Judge
*Printed name and title*

FILED
United States District Court
Albuquerque, New Mexico
Mitchell R. Elfers
Clerk of Court

# AFFIDAVIT IN SUPPORT OF
# APPLICATION FOR SEIZURE WARRANT

I, Kevin M. Mondragon, Special Agent (SA) of the Drug Enforcement Administration (DEA), hereinafter referred to as the Affiant, being duly sworn, state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am submitting this Affidavit in support of an application for the issuance of a Seizure Warrant for the entirety of the funds held in Rio Grande Credit Union, account # 1000103299. The sole account holder is Marcos Cordova (Cordova) who, according to the account records, resides at 10531 Duke Avenue SW, Albuquerque, NM.

2.      As an SA of the DEA, I am an investigative law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7). I am empowered by law to conduct investigations, make seizures of property, and make arrests for criminal offenses as set out in 21 U.S.C. § 878. I have been an SA with the DEA since October 2010. I am currently assigned to the El Paso Field Division, Albuquerque District Office (ADO). I have been a law enforcement officer for 23 years, serving as a sheriff's deputy, a police officer and an SA. Over the course of my career I have accumulated he following training and experience:

   a.      I graduated from the DEA Academy in Quantico, Virginia, where I received approximately 19 weeks of specialized narcotics-related training. The training covered controlled substance identification, narcotics-related investigative techniques, interviews and interrogations, preparing applications for search warrants and seizure warrants, surveillance and electronic monitoring techniques, money-laundering investigations, and

    various forensic subjects including latent fingerprint collection and analysis.

  b. As a certified Police Officer and DEA SA, I have participated in numerous investigations of individuals and organizations trafficking heroin, cocaine, cocaine base (crack), marijuana, methamphetamine, fentanyl and other controlled substances.  My experience as an SA includes conducting surveillance; interviewing witnesses; participating in arrests, searches, and seizures; working in an undercover capacity and working with informants; writing wiretap affidavits; and investigating money-laundering cases.

  c. I have received training and experience in the investigation of violations of federal and state drug and money-laundering laws.  I have participated in the investigation of several drug trafficking conspiracies.  As a result, I am familiar with the means and methods used by persons and drug trafficking organizations to purchase, transport, store, and distribute illegal drugs and to hide profits generated from those transactions.

3. I have been involved in an ongoing investigation into the distribution of controlled substances, specifically fentanyl, methamphetamine, and heroin, by Cordova.  Since the investigation's inception, other law enforcement officers and I have obtained information regarding the illegal drug trafficking activities of Cordova and others (the "SUBJECTS").

4. I make this affidavit based upon my own personal knowledge, which is substantially derived from my participation in the investigation, as well as the knowledge of fellow law enforcement agents and officers who have participated in the investigation.

In addition, I have developed information I believe to be reliable from other sources, including:

    a.    Information provided by SAs, and Intelligence Research Specialists of the DEA, and other law enforcement officials (collectively "agents"), including oral and written reports that I have received directly or indirectly from these investigators;

    b.    Reports of physical and electronic surveillance conducted by agents during the investigation;

    c.    A review of telephone toll records and subscriber information;

    d.    A review of driver's license and automobile registration records;

    e.    Records from commercial databases;

    f.    Records from the National Crime Information Center;

    g.    GPS ping and vehicle tracking data;

    h.    Other agents' affidavits;

    i.    Review of financial records.

5.    Through my training, experience, and consultation with other law enforcement officers experienced in investigations regarding conspiracy to manufacture, distribute, and possess with intent to distribute controlled substances, I have learned that:

    a.    Drug transactions are usually conducted on a cash-basis.

    b.    Drug dealers often accumulate thousands of dollars in cash from the criminal sale of controlled substances. Drug dealers often retain that cash to avoid generating currency transaction reports and to perpetuate and

        finance their drug trafficking business. Drug traffickers' unexplained wealth may provide evidence of their criminal activities.

    c.    Persons involved in drug trafficking often convert cash proceeds from the sale of controlled substances into other monetary instruments (such as cashier's checks, money orders, bank drafts) in manner and by means intended to conceal or disguise the nature, source, ownership and control of the criminal proceeds.

6.    This Affidavit is submitted for the limited purpose of establishing probable cause to support the issuance of a Seizure Warrant to seize the property and/or money described below. I have therefore not included each and every fact known to me concerning this investigation.

## PROPERTY TO BE SEIZED

7.    I make this Affidavit in support of an application for the issuance of a Seizure Warrant pursuant to Rule 41 of the Federal Rules of Criminal Procedure, Title 18 United States Code sections 981 and 982, and Title 21 United States Code sections 853 and 881, for:

> **The contents of Rio Grande Credit Union bank account # 1000103299, held by Rio Grande Credit Union at 301 Rio Bravo SE, Albuquerque, NM 87105 (the "SUBJECT PROPERTY")**

8.    Based upon the facts detailed in this Affidavit, probable cause exists to believe that the SUBJECT PROPERTY represents either (1) moneys furnished in exchange for a controlled substance, (2) moneys intended to be furnished in exchange for a controlled substance, (3) proceeds traceable to such an exchange, or (4) moneys used or intended to

4

be used to facilitate the manufacture, distribution, or possession with intent to distribute a controlled substance.  Accordingly, the SUBJECT PROPERTY is subject to forfeiture under 21 U.S.C. § 881(a)(6), among other federal forfeiture provisions.

## RELEVANT CRIMINAL STATUTES AND CRIMINAL FORFEITURE STATUTES

9. Title 21 United States Code § 841(a) provides that "[e]xcept as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance; (2) to create, distribute, or dispense, or possess with intent to distribute or dispense, a counterfeit substance." 21 U.S.C. § 841(a).  Subsection (b) designates the penalties corresponding to various controlled substances in various amounts.  These controlled substances include methamphetamine, fentanyl, and heroin. 21 U.S.C. § 841(b).

10. Title 21 United States Code § 846 provides that "[a]ny person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy." 21 U.S.C. § 846.

11. Title 21 United States Code § 853(a) provides, in relevant part, the following:

> Any person convicted of a violation of this subchapter or subchapter II punishable by imprisonment for more than one year shall forfeit to the United States, irrespective of any provision of State law—(1) any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of such violation; (2) any of the person's property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violation.

21 U.S.C. § 853(a).

12. Title 21 United States Code § 853(f) provides that "[t]he Government may request the issuance of a warrant authorizing the seizure of property subject to forfeiture under this section in the same manner as provided for a search warrant.  If the court determines that there is probable cause to believe that the property to be seized would, in the event of conviction, be subject to forfeiture and that an order under subsection (e) may not be sufficient to assure the availability of the property for forfeiture, the court shall issue a warrant authorizing the seizure of such property."[1]  21 U.S.C. § 853(f).

13. Title 21 United States Code § 881(a)(6) provides that "[t]he following shall be subject to forfeiture to the United States and no property right shall exist in them: . . . (6) All moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter."  21 U.S.C. § 881(a)(6).

14. Title 21 United States Code § 881(b) provides that "[a]ny property subject to forfeiture to the United States under this section may be seized by the Attorney General in the manner set forth in section 981(b) of Title 18."  21 U.S.C. § 881(b).

15. Title 21 United States Code § 881(e) provides for the disposition of property civilly or criminally forfeited pursuant to federal narcotics statutes.

---

[1] 21 U.S.C. § 853(e) provides for protective orders to restrain certain property or enjoin its use/alienation.  This provision also provides for the execution of a performance bond or other action to preserve the availability of property for forfeiture.  As described in more detail below, however, there is reason to believe that these measures would be insufficient to preserve the availability of the property for forfeiture in the present situation.

16. Title 18 U.S.C. § 1956(a)(1) provides the following:

> Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . . (B) knowing that the transaction is designed in whole or in part— (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity . . . shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

17. Title 18 U.S.C. § 1956(h) states that "[a]ny person who conspires to commit any offense defined in this section or section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy."

18. Title 18 U.S.C. § 1956(c)(9) defines "proceeds" as "any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, including the gross receipts of such activity."

19. Title 18 U.S.C. § 1957(a) provides that "[w]hoever, in any of the circumstances set forth in subsection (d), knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished as provided in subsection (b)." Subsection (d) provides, in relevant part, that "[t]he circumstances referred to in subsection (a) are—(1) that the offense under this section takes place in the United States or in the special maritime and territorial jurisdiction of the United States."

20. Criminal forfeiture authority for property involved in or traceable to violations of 18 U.S.C. §§ 1956 and 1957 exists under 18 U.S.C. § 982(a)(1), which provides: "[t]he court, in imposing sentence on a person convicted of an offense in violation of section

7

**1956**, **1957**, or 1960 of this title, shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property." 18 U.S.C. § 982(a)(1) (emphasis added).

21.     Title 18 United States Code § 982(b)(1) provides that "[t]he forfeiture of property under this section, including any seizure and disposition of the property and any related judicial or administrative proceeding, shall be governed by the provisions of section 413 (other than subsection (d) of that section) of the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. 853)."

## RELEVANT CIVIL FORFEITURE STATUTES

22.     Title 18 United States Code § 981(b)—which is referred to by 21 U.S.C. § 881(b) (above)—governs civil seizure and forfeiture of property by the Attorney General and other designated individuals.

23.     Title 18 United States Code § 981(b)(2) provides, in relevant part, that "[s]eizures pursuant to this section shall be made pursuant to a warrant obtained in the same manner as provided for a search warrant under the Federal Rules of Criminal Procedure." 18 U.S.C. § 981(b)(2).

24.     Civil forfeiture authority for property involved in or traceable to violations of 18 U.S.C. §§ 1956 and 1957 exists under 18 U.S.C. § 981(a)(1), which provides: "The following property is subject to forfeiture to the United States: (A) Any property, real or personal, involved in a transaction or attempted transaction in violation of section **1956**, **1957** or 1960 of this title, or any property traceable to such property." (emphasis added).

**PROBABLE CAUSE**

25.     Since approximately June 2022, agents have been investigating Cordova's illegal drug trafficking activities.  During the course of the investigation, agents have learned through interviews of other SUBJECTS, surveillance efforts, and information obtained in connection with Cordova's arrest in December 2022, that Cordova is a large-scale drug dealer operating in the Albuquerque area.

26.     On December 22, 2022, agents executed a federal search warrant on Cordova's vehicle, a 2010 Chevrolet Camaro, in Albuquerque, NM.  The 2010 Chevrolet Camaro bears a vehicle identification number (VIN) matching the information for a 2010 Chevrolet Camaro registered in Cordova's name.

27.     In the trunk of the 2010 Chevrolet Camaro, agents observed a large speaker box. Within the speaker box was a hidden compartment where agents located approximately $13,000 of U.S. currency, as well as approximately four pounds (approximately 1,814 gross grams) of a clear, rock-like substance, which field-tested positive for methamphetamine.  Agents also located approximately 18,000 fentanyl pills.  These pills field-tested positive for fentanyl and had a gross weight of 2022.7 grams.  Agents also found three bundles wrapped in plastic containing a dark, sticky substance, which field-tested positive for heroin, and weighed approximately 130 gross grams.  In addition, inside the same speaker box was a digital scale, which in my training and experience is commonly used by drug traffickers for weighing quantities of narcotics.

28.     Based on the large quantity of narcotics, cash, and scale recovered from Cordova's vehicle, agents believe Cordova's principal source of income is illegal drug sales.  Based on the fact that the fentanyl and methamphetamine were found in the hidden

compartment with the U.S. Currency, agents believe that the money seized from the vehicle constitutes either illegal drug proceeds or funds intended for use in narcotics transactions.

29. On December 22, 2022, agents executed a federal search warrant at 10531 Duke Avenue SW, Albuquerque, NM, a known residence for Cordova. In a bedroom, agents located $4,491.00 of U.S. Currency and a money-counting machine. In a safe in the bathroom of the master bedroom, agents also located $26,120 of U.S. Currency. Agents also located $1,034.00 of U.S. Currency in Cordova's 2019 Toyota Tacoma, registered to him, which was parked in the driveway and was included in the property subject to the search warrant. On December 22, 2022, Cordova was arrested and charged federally with possession of a controlled substance and remains in federal custody.

### Cordova's money laundering activities

30. Pursuant to a court order, agents reviewed Cordova's Rio Grande Credit Union records. An analysis of the records showed suspicious activity within account number 1000103299, in the sole name of Cordova between the dates of July 1, 2022, and August 18, 2022. Cordova deposited two official bank checks (cashier's checks) totaling $100,000. The deposited checks were issued from Nusenda Credit Union in the amount of $50,000 each and referenced the name Edward Martinez. Cordova also completed three cash deposits totaling $27,649. Following the last cash deposit on August 18, 2022, Cordova withdrew $149,813.60 from his account to purchase a cashier's check for $149,811.60 made payable to Old Republic Title. Agents believe this transaction was the purchase for the real property located a 5109 Lomas De Atrisco Road NW, Albuquerque, NM.

**Analysis of Nusenda Credit Union Account**

31.     As part of the investigation, agents have reviewed Edward Martinez's Nusenda Credit Union records.  An analysis of the records discovered suspicious activity within account number 2244520 in the names of Edward Martinez and Daniella Salazar relating to transactions with Cordova's account. The beginning balance in the Nusenda Bank account was approximately $45,500 on July 1, 2022, when a cash deposit in the amount of $6,000 occurred. The deposit was followed by a withdrawal in the amount of $50,000 in the form of a cashier's check made payable to Cordova.

32.     Between July 11, 2022, and August 5, 2022, several large cash deposits occurred to replenish the account. Following the last cash deposit in the amount of $12,000 on August 5, 2022, a second cashier's check in the amount of $50,000 made payable to Cordova was issued from the Nusenda Bank account.  Beginning on August 29, 2022, through October 20, 2022, several large cash deposits occurred to replenish the account. From July through October, the cash deposits totaled $83,490.

33.     As part of the investigation, agents obtained records from Old Republic Title Company regarding Cordova's purchase of 5109 Lomas De Atrisco Road NW, Albuquerque, NM.  On August 19, 2022, Cordova purchased the property located at 5109 Lomas De Atrisco Road NW, Albuquerque, NM 87120 with a purchase price of $145,000.  Cordova issued Old Republic Title a cashier's check in the amount $149,811.60 on August 19, 2022, to finalize the purchase of the above-mentioned property.

**Interview of Edward Martinez**

34.     Agents interviewed Edward Martinez on January 3, 2023, to inquire about his bank account activity from July through October 2022.  Agents presented him with an official bank check in the amount of $50,000 made payable to Cordova.  Martinez acknowledged the check and stated that he was asked by Cordova to get him a bank check.  Martinez stated that he worked with Cordova in the past, but they do not communicate on a regular basis.  Edward Martinez stated he had been shot in the face a few years back and had received a large amount of money from an insurance company.  Cordova was aware that Martinez had been shot and that he had received that large sum of money.  Martinez further stated he had not recently been in contact with Cordova until he was asked by Cordova to lend him money.  Cordova told Martinez that he needed a bank check and asked Martinez if he would provide him a check, which Martinez agreed.  Cordova further agreed to pay him back.  Martinez was not sure if Cordova was buying a house or remodeling a house but recalls that it was why Cordova needed the money.  Martinez did not ask Cordova further questions.  Martinez further stated that Daniella Salazar is his child's mother and had nothing to do with the above transactions.

35.     Martinez stated that he felt intimated by Cordova but trusted Cordova would pay him back.  Martinez agreed to obtain an official bank check in the amount of $50,000 for Cordova, with the understanding that Cordova would pay him back. They did not have an agreed upon schedule of repayment amounts or timeframe. Cordova and Martinez agreed that after Martinez provided Cordova with the bank check, they would meet at a bank where Cordova would give Martinez cash for repayment.  Martinez would then deposit the money back into his bank account.  Martinez stated he was repaid in full when he was

asked by Cordova to get him another bank check for $50,000 and again, Cordova would pay him back. Martinez provided Cordova with the second bank check in the amount of $50,000. Martinez received cash payments from Cordova to deposit into Martinez's account. Martinez stated he received all of his money back from Cordova and has not had any communications with Cordova since.

36. Based on the fact that Cordova solicited Martinez to write him two checks for $50,000 each for the purchase of 5109 Lomas De Atrisco Road NW, and reimbursed Martinez in cash payments, agents believe Cordova committed money laundering through the Nusenda bank account # 2244520, then through Cordova's Rio Grande Credit Union # 1000103299. The fact that Cordova approached Martinez for the $100,000 in checks demonstrates that Cordova was attempting to avoid suspicious activities to his bank account. Additionally, the fact that Cordova reimbursed Martinez with cash further verifies Cordova avoided a paper trail to show that he was committing money laundering. The fact Cordova did not write the checks himself from his account to make the purchase for 5109 Lomas De Atrisco Road NW, further illustrates he avoided such large transactions going through his account to conceal his illegal drug trafficking proceeds. Based on these transactions, your Affiant submits that there is probable cause to believe that the entirety of the funds held in the Rio Grande Credit Union account belonging to Cordova (i.e., the SUBJECT PROPERTY) constitutes property involved in money laundering in violation of 18 U.S.C. §§ 1956 and 1957.

37. Based on the fact that Cordova has been arrested and charged federally for drug trafficking offences, the money seizures from December 22, 2022, from Cordova's residence, his 2010 Chevrolet Camaro, his 2019 Toyota Tacoma, and the fact that

Cordova has no legitimate source of income, agents believe the majority of his income is derived from the illegal sale of drugs. According to New Mexico work force solutions, Cordova has no report source of income. Agents further believe that the majority of the money contained in account #1000103299 is from the sale of illegal drugs.

38. In January 2023 agents obtained the purchase agreement records for Cordova's 2019 Toyota Tacoma. Records indicate that on July 28, 2022, Cordova purchased the 2019 Toyota Tacoma at the Auto Station car lot located in Albuquerque, NM for $36,750.00. In the purchase agreement, the records indicate "cash due on delivery" was $36,750.00. Agents believe that Cordova paid cash for the 2019 Toyota Tacoma. This illustrates Cordova is capable of paying for assets, while not possessing a legitimate source of income, and is capable of cash on demand.

39. Based on my training and experience I believe that efforts to restrain or enjoin the use of the SUBJECT PROPERTY pursuant to 21 U.S.C. § 853(e) would be insufficient to maintain the property for forfeiture unless they amounted to maintaining the property in the custody of the United States without allowing any use or dissipation (which is essentially the effect of the seizure warrant). Bank account deposits constitute a liquid asset that is easy to dissipate and difficult to trace once withdrawn from a financial institution. Furthermore, the SUBJECT PROPERTY constitutes evidence of violations of Title 21 United States Code 841 and 846 and should be maintained in the custody of the United States to facilitate its evidentiary use, as well as its forfeiture.

**CONCLUSION**

40. Based on the above facts and circumstances, I respectfully submit that there is probable cause to believe that the SUBJECT PROPERTY represents proceeds of illegal drug trafficking, money to be furnished in exchange for controlled substances, or money used or intended to be used to facilitate illegal drug trafficking in violation of Title 21 United States Code sections 841 and 846. As such, the SUBJECT CURRENCY is subject to seizure and forfeiture to the United States Government pursuant to Rule 41 of the Federal Rules of Criminal Procedure, Title 18 United States Code sections 981 and 982, and Title 21 United States Code sections 853 and 881(a)(6).

41. I further request that a seizure warrant direct the above-listed financial institution at which the above account is maintained to do the following:

   \*   freeze the contents of the account in place and to refuse the withdrawal of any amount from the account by anyone other than the DEA, and

   \*   while any contents of the account are frozen in place to accrue deposits, interest and dividends, until DEA directs that the contents of the accounts be finally liquidated and no contents remain. Freezing the contents could occur in the event the bank is unable to provide the funds immediately to the DEA and therefore restricts the removal and/or dissipation of the funds by the account holder(s).

I swear this information is true and correct to the best of my knowledge.

This Affidavit was reviewed and approved by AUSA Taylor Hartstein on January 9, 2023.

_____
Kevin M. Mondragon
Special Agent
Drug Enforcement Administration

Electronically submitted to me and sworn
by telephone on this ___9th___ of January, 2023

_____
United States Magistrate Judge

**Attachment A**

Special Agents of the Drug Enforcement Administration (DEA), are authorized to effect the seizure of the accounts described in this warrant or, in the event the institution is unable to provide the funds immediately to the DEA, to direct the financial institution at which the accounts are established to freeze the contents of the accounts in place and to refuse the withdrawal of any amount from the accounts by anyone other than the Drug Enforcement Administration, for a period of up to fourteen days or until January 24, 2023 , whichever is sooner. While any contents of the accounts are frozen in place, the accounts shall continue to accrue deposits, interest, and dividends, until the DEA directs that the contents of the accounts be finally liquidated and no contents remain, provided that this occurs within fourteen days or on or before January 24, 2023 whichever is sooner.